DECISION AND JUDGMENT ENTRY
{¶ 1} Terry A. Peterson appeals the judgment of the Ross County Court of Common Pleas, which affirmed the Unemployment Compensation Review Commission's ("Commission's") finding that he was terminated by Ingle Barr, Inc. ("Ingle Barr") for just cause and is therefore not entitled to unemployment benefits. Peterson argues that he was not discharged for just cause under R.C.4141.29(D)(2)(a) because Ingle Barr did not comply with the progressive discipline policy outlined in Rule No. 2 of its employee handbook. He also contends that his absenteeism did not constitute just cause for termination even if he did violate Ingle Barr's disciplinary rules.
 {¶ 2} We agree that Ingle Barr did not comply with Rule No. 2, which required that Peterson receive two written warnings before being terminated for failing to properly notify his supervisor that he would not be reporting to work. Nonetheless, we conclude that Rule No. 7, which does not require any written warnings before an employee is deemed to have voluntarily quit after failing to report to work three times, also applies. We conclude that Ingle Barr had just cause to terminate Peterson due to his failure to report to work without notification on more than three occasions. Therefore, the trial court did not err in affirming the Commission's denial of Peterson's claim for unemployment benefits.
 {¶ 3} Ingle Barr employed Peterson as a construction carpenter from July 2001 until August 2002, when he was terminated. Following his discharge, Peterson filed an application for unemployment benefits. The Director of the Ohio Department of Job and Family Services ("ODJFS") determined that Ingle Barr discharged Peterson for cause and denied the benefits claim. Peterson appealed this determination and a hearing officer appointed by the Commission held an evidentiary hearing.
 {¶ 4} Peterson and Steve Bittendorf, a project manager and supervisor at Ingle Barr, testified at the hearing. Bittendorf testified that Peterson failed to report to work on March 19, June 12, June 14, June 18, July 11, August 13, and August 14, 2002, and failed to inform his employer that he would be absent on each of these days. Bittendorf stated that Peterson reported to work on July 12th, but he did not look good and Bittendorf believed he was hung over. Consequently, Bittendorf initiated a conversation with Peterson about his "no-shows." Bittendorf informed Peterson that he needed to start coming to work or calling. Peterson received no written warnings or reprimands. When asked by the hearing officer if Peterson knew that his job was in jeopardy, Bittendorf responded affirmatively and stated that he told Peterson "enough was enough" and he "couldn't take it anymore."
 {¶ 5} Peterson testified that he worked on August 13th
and produced his paycheck stub to support his claim. However, Peterson admitted that he did not call in or work on August 14th. Peterson stated that he was very upset because his younger brother attempted suicide and he simply neglected to call work when he left town to be with his brother. On August 15th, Peterson called and informed Ingle Barr that he needed the rest of the week off and would return to work on Monday. When Peterson called Bittendorf on Monday, Bittendorf told him there was no work for him and he should return any Ingle Barr property in his possession. Peterson assumed he had been laid off and did not know he was terminated until August 23rd when he picked up his final pay check.
 {¶ 6} Peterson admitted that did not report to work or call in sick on March 19, June 12, June 14, June 18 and July 11. Peterson testified that he smashed three fingers on his right hand on March 18th and couldn't sleep that night because of the pain. Peterson stated that his foreman was aware of the injury and he asked his friend who drove him to work to tell the foreman he would be absent. Peterson testified that he does not have a home telephone and that the nearest pay phone is two blocks from his house.
 {¶ 7} Peterson testified that he has degenerative lumbar disc disease. During June, he was unloading semi-trailers at work and his back began hurting on June 11th. He did not report to work on June 12th because of the pain but returned on June 13th. On the evening of June 13th, his back began hurting again and he did not work the following day. The following week, the same situation occurred. Peterson testified that he did not visit the doctor because he lacks health insurance. However, his doctor instructed him to treat his back with ice when it flares up and Peterson complied with these directives.
 {¶ 8} Peterson testified that he was ill on July 11th and failed to call his employer. He received a verbal warning on July 12th and informed Bittendorf that he was tired, not hung over. Peterson stated that he was not aware of the company's policies regarding absences and that Bittendorf never informed him he would be terminated if he had any further absences. Peterson denied receiving a copy of his employer's policies when he was hired, but acknowledged signing a form confirming his review of the policies.
 {¶ 9} Peterson testified that Ingle Barr knew he suffered from Hepatitis C. He can become violently ill as a result of this disease and is then unable to leave his home to call work. Peterson also testified that Ingle Barr knew he did not have a telephone or a driver's license when he was hired.
 {¶ 10} The hearing officer concluded that Peterson was discharged by Ingle Barr for just cause and, therefore, was not entitled to unemployment benefits. In reaching this conclusion, the hearing officer noted that after five absences without calling, Peterson was verbally warned that his continued absence without notice would not be tolerated. Nonetheless, Peterson did not report to work or call his employer on August 14th. The hearing officer concluded that some of the circumstances surrounding Peterson's work absences were beyond his control, but several significant circumstances were not. Specifically, Peterson failed to maintain a telephone at his residence, making it difficult to contact his employer, and lost his driver's license, complicating his ability to attend work regularly. Because Peterson failed to report to work on August 14th even after being warned on July 12th that his attendance record must improve to maintain his employment, the hearing officer concluded that Peterson's discharge was supported by just cause.
 {¶ 11} Peterson filed a request for a review of the hearing officer's decision with the Commission. This request was disallowed and Peterson subsequently appealed the decision to the Ross County Court of Common Pleas pursuant to R.C. 4141.282(O). Peterson argued that the hearing officer's decision was unlawful and against the manifest weight of the evidence. He contended that his discharge was without just cause due to Ingle Barr's failure to follow its own progressive disciplinary policy.
 {¶ 12} The trial court rejected Peterson's claim. The court concluded that, although Peterson did not receive any written warnings as required by Rule No. 2 of the company's policy, he received an oral warning about the consequences of his conduct and an opportunity to correct his improper conduct prior to his discharge. Relying on Durgan v. Ohio Bur. of Emp. Serv. (1996),110 Ohio App.3d 545,[1] the court concluded that an employer's oral warning, despite a company policy requiring a written warning, is sufficient under a company's progressive discipline process. The court further concluded that the cases cited by Peterson in support of his claim are distinguishable because they involve employees who received no warning prior to discharge or had not accumulated a sufficient number of violations to merit discharge under company policy. The trial court noted that Peterson was subject to discharge after three absences without notification and that he had six such absences. The court concluded that Peterson was terminated for good cause and affirmed the Commission's decision.
 {¶ 13} Peterson filed a timely appeal of the trial court's decision, assigning the following errors: "Assignment of ErrorNo. 1 — The Court of Common Pleas erred in affirming the Review Commission's finding that Mr. Peterson was discharged for just cause under O.R.C. § 4141.29(D)(2)(a) where he was discharged in violation of the employer's progressive discipline policy.Assignment of Error No. 2 — The Court of Common Pleas erred in affirming the Review Commission's finding that Mr. Peterson's conduct constituted just cause for discharge under O.R.C. §4141.29(D)(2)(A)." In both of his assignments of error, Peterson argues that there was no just cause for his discharge and, therefore, he is entitled to unemployment compensation benefits.
 {¶ 14} Unlike most administrative appeals where we employ an abuse of discretion standard, see Lorain City School Dist. Bd.of Edn. v. State Emp. Relations Bd. (1988), 40 Ohio St.3d 257,260-261, 533 N.E.2d 264, our review of an appeal from the decision of the Commission is identical to that of the common pleas court. We must affirm the Commission's decision unless we find the decision to be unlawful, unreasonable, or against the manifest weight of the evidence. See R.C. 4141.28(N)(1);Tzangas, Plakas Mannos v. Ohio Bur. Of Emp. Serv.,73 Ohio St.3d 694, 696, 1995-Ohio-206, 653 N.E.2d 1207.
 {¶ 15} In making this determination, we must give deference to the Commission in its role as finder of fact. We may not reverse the Commission's decision simply because "reasonable minds might reach different conclusions." On close questions, where the board might reasonably decide either way, we have no authority to upset the agency's decision. Irvine v. UnemploymentComp. Bd. of Rev. (1985), 19 Ohio St.3d 15, 18, 482 N.E.2d 587. Instead, our review is limited to determining whether the Commission's decision is unlawful, unreasonable or totally lacking in competent, credible evidence to support it. Id.
 {¶ 16} R.C. 4141.29(D)(2)(a) provides that an individual may not obtain unemployment benefits if he "has been discharged for just cause in connection with his work." See, also, Ford MotorCo. v. Ohio Bur. of Emp. Serv. (1991), 59 Ohio St.3d 188, 189,571 N.E.2d 727. "Just cause" exists if a person of ordinary intelligence would conclude that the circumstances justify terminating the employment. Irvine, supra, at 17,482 N.E.2d 587. An analysis of just cause must also consider the policy behind the Unemployment Compensation Act, which was intended to provide financial assistance to individuals who become unemployed through no fault of their own. Tzangas, supra, at 697,653 N.E.2d 1207. Accordingly, "fault" on an employee's part is an essential component of a just cause termination. Id. at paragraph two of the syllabus. The determination of just cause depends on the "unique factual considerations" of a particular case and is, therefore, primarily an issue for the trier of fact. Irvine,
supra, at 17, 482 N.E.2d 587.
 {¶ 17} It is important to distinguish between just cause for discharge in the context of unemployment compensation and in other contexts. An employer may justifiably discharge an employee without incurring liability for wrongful discharge, but that same employee may be entitled to unemployment compensation benefits. See Adams v. Harding Mach. Co. (1989), 56 Ohio App.3d 150, 155,565 N.E.2d 858, 862.
 {¶ 18} In his first assignment of error, Peterson argues that the trial court erred in affirming the Commission's denial of unemployment benefits because he was discharged without just cause based on Ingle Barr's failure to follow its progressive disciplinary process before terminating him.
 {¶ 19} The trial court concluded that Ingle Barr terminated Peterson under Rule No. 2 of its employee handbook for having too many absences without proper notification. Under Rule No. 2 of the Ingle Barr "Work Rules and Regulations," employees are required to inform the personnel department, a superintendent, or a foreman by 7:30 a.m. on any day the employee will be absent. If an employee fails to comply with this rule, he is subject to a written warning following the first and second offenses, and discharge following the third offense. The court found that Ingle Barr did not comply with this rule as Peterson received no written warnings prior to his discharge. The trial court accepted Peterson's assertion that an employer must comply with its own disciplinary policies before terminating an employee, but nonetheless found that Peterson's discharge was for just cause because: (1) Peterson was given an oral warning that his job was in jeopardy but committed an additional offense following that warning; and (2) Peterson committed more than the three violations necessary for termination under the Ingle Barr disciplinary system.
 {¶ 20} While we have not previously considered whether an employer must comply with its disciplinary process when terminating an employee,[2] our colleagues in other appellate districts have generally concluded that where a company bypasses its progressive disciplinary system and terminates an employee, that employee's discharge is without cause for unemployment compensation purposes. In re Claim of Frazee (Dec. 13, 1984), Franklin App. No. 84AP-284; Interstate Brands Corp.v. Cogar (June 13, 1985), Cuyahoga App. No. 48704; Mullen v.Admr., Ohio Bur. of Emp. Serv. (Jan. 16, 1986), Cuyahoga App. No. 49891; Pickett v. Unemployment Comp. Bd. of Review (1989),55 Ohio App.3d 68, 70, 562 N.E.2d 521, 523; Eagle-PicherIndustries, Inc. v. Ohio Bur. of Emp. Serv. (1989),65 Ohio App.3d 548, 552, 584 N.E.2d 1245, 1247-1248.
 {¶ 21} In Interstate Brands Corp. v. Cogar, supra, the claimant's supervisor notified all his subordinates, including the claimant, that continued violations of the company's lunch hour policy would result in discipline. Thereafter, the claimant returned 15 to 20 minutes late from lunch and was discharged. The Unemployment Compensation Board of Review concluded that the employer bypassed its disciplinary procedure of issuing a verbal warning, then a written warning and then dismissing the offending employee and, therefore, the discharge was without just cause. The trial and appellate courts affirmed. In affirming, the appellate court noted that the employee was not given an opportunity to correct his conduct, in direct contravention of the progressive discipline system.
 {¶ 22} In Mullen, supra, the claimant was discharged by her employer because her disruptive attitude deleteriously affected her job performance and her relationship with her fellow employees. At the hearing, the company representatives described numerous instances of improper behavior on the claimant's part. The claimant received verbal warnings on two occasions and one written warning. Thereafter, the claimant was terminated for another instance of inappropriate behavior. Under the company disciplinary procedure, there was no set number of verbal warnings required prior to issuing a written warning. At the plant where the claimant worked, an individual could be given three written warnings and the third written warning could constitute grounds for immediate dismissal.
 {¶ 23} The Eighth District Court of Appeals determined that, because the claimant received one written warning prior to her discharge and a second in connection with her discharge, the employer failed to comply with its own disciplinary procedures when it fired the claimant. The court noted that: "Progressive disciplinary systems create expectations on which employees rely. Fairness requires an employee not be subject to more severe discipline than that provided for by company policy. See Bays v.Bd. of Rev. (1982), 9 Unempl.Ins.Rep., Para. 9412 and Bd. ofRev. v. Schmid (1975), 342 A.2d 553." The court then concluded that the employer lacked just cause to discharge the claimant because it did not follow its own disciplinary procedures when it terminated her.
 {¶ 24} In reaching its conclusion that Peterson's discharge was for just cause despite Ingle Barr's failure to follow it progressive disciplinary process, the trial court relied heavily on Durgan v. Ohio Bur. of Emp. Serv. (1996),110 Ohio App.3d 545, 674 N.E.2d 1208. In Durgan, the claimant was discharged for chronic absenteeism. The evidence showed that management personnel counseled the claimant on two occasions regarding her high absenteeism rate. At a third meeting, the claimant was demoted. Her absenteeism rate continued to escalate and two subsequent meetings were held in which the claimant was warned that her absenteeism threatened her job. Thereafter, the claimant was discharged.
 {¶ 25} The claimant asserted that her discharge was without just cause because her employer failed to follow the established discipline procedure which required a warning slip to be issued if more than ten days per year were missed. The Ninth District Court of Appeals concluded that the employer's failure to issue this warning slip was irrelevant since the claimant repeatedly met with management and was orally warned that she could be terminated because of her poor attendance. The court noted that the discussions held in those meetings were reduced to writing in memoranda and confirmed that the claimant knew she could be terminated if her attendance did not improve.
 {¶ 26} ODJFS relies heavily upon Spayde v. Hi-Stat FloridaMfg. Co., Inc. (Nov. 23, 1992), Richland App. No. 92-CA-37, in support of its position that Peterson's discharge was for just cause. In Spayde, the claimant was discharged by his employer for excessive tardiness and absenteeism. Pursuant to the employer's progressive discipline policy, the claimant was given first and second warnings on the same day. He was then suspended for two days, after accumulating six absences. The policy provided for a five-day suspension after seven absences, which was not imposed. The policy allowed termination after eight absences within two successive quarters, and the claimant was terminated with eight absences and one tardy.
 {¶ 27} The claimant argued that his discharge was not for just cause because his employer failed to impose a five-day suspension following his seventh absence. The trial court concluded that this failure was immaterial because the claimant had accumulated eight absences and a short time period had elapsed between the two-day suspension and the accumulation of eight absences. The appellate court affirmed, noting that requiring employers to follow every step in a disciplinary process would work to the detriment of the employees. The court reasoned that employers would not give employees "breaks" since failure to impose each successive penalty to the letter would result in the loss of the employer's ability to terminate the employee if the problem persisted.
 {¶ 28} Having reviewed the relevant case law, we agree with the court's reasoning in Bays v. Bd. of Rev., supra, that "[i]f an explicit work rule also is accompanied by an explicit penalty, then fairness dictates that an employee not be subjected to punishment greater than the stated penalty." Further, "[I]f employers expect their work rules to be obeyed then they must discipline their employees in accordance with those rules." Id. Rule No. 2 of the Ingle Barr disciplinary policy provides for two written warnings before an employee is discharged for failing to provide adequate notice of an absence. However, Peterson was given one oral warning and no written warnings prior to his termination for this violation. Consequently, none of the requisite disciplinary steps under that rule were followed.
 {¶ 29} Although the trial court concluded that Peterson received adequate warning that he could be terminated for future violations, the case law does not support the court's finding that an employer can "override" its disciplinary policy requiring written warnings by orally informing an employee that future disciplinary violations will result in termination. In Durgan,
which the trial court relied upon, the claimant met with management on five separate occasions regarding her high absenteeism rate. Nonetheless, the claimant objected to the Board's finding of just cause for termination on the ground that she had not received a written warning prior to her termination. In rejecting this claim, the court noted that the substance of the meetings had been summarized in writing and, therefore, the claimant received adequate notice that she could be terminated. The court did not find that oral warnings could substitute for written warnings in all cases. Rather, the Durgan court determined that there was substantial evidence that the claimant knew that a future violation would result in termination and that the employer had substantially complied with its self-imposed disciplinary system. That evidence is not present here.
 {¶ 30} We also reject the trial court's conclusion that Ingle Barr's failure to issue written warnings is irrelevant because Peterson committed six violations and could have been terminated under Rule No. 2 after only three violations. According to Bittendorf's testimony, Peterson had five "no-shows" before Bittendorf gave Peterson the oral warning. Then, after his next violation, Peterson was terminated. Bittendorf offered no explanation as to why Peterson was not disciplined for his first four "no-shows."
 {¶ 31} ODJFS relies heavily on Spayde, which held that a skipped disciplinary step was insignificant because the claimant had accrued a sufficient number of violations to warrant discharge. However, in Spayde, the employer skipped only one of four disciplinary steps prior to termination. Therefore, the employer substantially complied with its progressive disciplinary process. Here, Ingle Barr did not comply with any of the disciplinary procedures of Rule No. 2 before terminating Peterson. There is no evidence that the employer in Spayde
terminated that claimant for earlier actions that were not addressed through the disciplinary process, as ODJFS asks us to allow here. Rather, the claimant in Spayde apparently committed additional violations immediately following the third step of the disciplinary process and those violations, in conjunction with the prior violations for which the claimant was disciplined, were of sufficient number to justify termination under the policy. While we agree with the Fifth District's holding in Spayde,
supra, that strict compliance with progressive disciplinary policies is unnecessary to support a finding of just cause for termination, at least some compliance is necessary.
 {¶ 32} Because Ingle Barr did not substantially comply with Rule No. 2 before terminating Peterson, we reject the trial court's reasons for affirming the decision of the Unemployment Compensation Review Commission's decision. Nonetheless, we conclude that the trial court reached the correct result. We are not authorized to reverse a correct judgment simply because the trial court stated an erroneous basis for that judgment. Myersv. Garson, 66 Ohio St.3d 610, 614, 1993-Ohio-9, 614 N.E.2d 742;Joyce v. Gen. Motors Corp. (1990), 49 Ohio St.3d 93, 96,551 N.E.2d 172.
 {¶ 33} Although Rule No. 2 requires two written warnings before Ingle Barr can terminate an employee for failing to provide adequate notice of an absence, Rule No. 7 states that if an employee fails to report to work on three occasions he will be deemed to have "voluntary quit." Neither the hearing officer nor the trial court considered this rule in reaching their decisions. However, after reviewing the record and the hearing officer's findings, we conclude that Rule No. 7 is applicable to Peterson's termination.
 {¶ 34} Peterson admits that he did not report to work or notify his employer that he would be absent on March 19, June 12, June 14, June 18, July 11 and August 14. In the "Notice of Termination of Employment" issued to Peterson, Ingle Barr indicated that Peterson was being terminated for "To [sic] many no shows." Peterson contends that he did not work on March 19 because he injured his hand the day before and could not sleep due to the pain, on June 12, 14 and 18 because of a back injury, on July 11 because he was ill, and on August 14 because his brother attempted suicide. Although Peterson testified that he asked his co-worker to inform the foreman that he would be absent on March 19, Peterson concedes that he did not telephone or make other efforts to inform anyone at Ingle Barr that he would not be reporting to work on any of the other five occasions.
 {¶ 35} R.C. 4141.29(D)(2)(a) states that an individual may not obtain unemployment benefits if he "quit his work without just cause." Just cause in the "quit" context is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act. Irvine v. Unemp. Comp. Bd.of Review (1985), 19 Ohio St.3d 15, 17, 482 N.E.2d 587.
 {¶ 36} The hearing officer found, and Peterson concedes, that Peterson did not report to work or call on six separate occasions. Peterson blames his inability to communicate with his employer on his lack of a home telephone and the fact that he was too ill to walk to the nearest pay phone. We conclude that Peterson's failures to communicate with his employer are not justified. While we do not dispute that Peterson was ill or injured on the days he missed work, an employer must be able to properly schedule and manage its employees. Peterson knew that he was frequently ill and should have made accommodations to contact his employer when necessary. Because Peterson failed to report to work on more than three occasions without notifying his employer, Ingle Barr properly discharged Peterson pursuant to Rule No. 7. Peterson's first assignment of error is overruled.
 {¶ 37} In his second assignment of error, Peterson argues that even if his actions violated Ingle Barr's disciplinary policy, he was still not discharged for just cause. Peterson contends that he was ill or dealing with a family emergency on each of the days he missed work and that the hearing officer should have considered the circumstances surrounding each absence before denying his claim for unemployment compensation. Peterson also argues that his supervisors at Ingle Barr knew he did not have a telephone and that he would be unable to easily contact them if he became ill when they hired him. Lastly, Peterson contends that he did not have adequate notice that he was required to inform a supervisor if he was unable to work.
 {¶ 38} Although an employer may require specific standards of conduct and then discharge an employee who violates these standards, "[t]he critical issue is not whether the employee has technically violated some company rule, but whether the employee by his actions demonstrated an unreasonable disregard for his employer's best interest." Piazza v. Ohio Bur. of Emp. Serv.
(1991), 72 Ohio App.3d 353, 357, 594 N.E.2d 695, citing Williamsv. Ohio Bur. of Emp. Serv. (Nov. 27, 1985), Cuyahoga App. No. 49759 and Kiikka v. Ohio Bur. of Emp. Serv. (1985),21 Ohio App.3d 168, 169, 486 N.E.2d 1233.
 {¶ 39} Peterson clearly demonstrated an unreasonable disregard for his employer's best interest when he failed to report to work without calling. Ingle Barr expected Peterson to report to work when scheduled. If Peterson was unable to report, he should have at least informed his supervisor or foreman so other arrangements could be made. Although Peterson contends that he had legitimate excuses for not reporting to work on each occasion, this fact is irrelevant. Ingle Barr did not argue that Peterson was not ill or that he should have reported to work on any of the days he missed. Rather, Ingle Barr asserted that Peterson repeatedly disregarded the company's best interest by failing to inform his supervisor or foreman when he would not be working. Therefore, the hearing officer did not err in failing to examine the reasons for each absence.
 {¶ 40} We also reject Peterson's assertion that his supervisors should have recognized that he would be unable to call in sick because they knew he did not have a telephone. Peterson could have used a neighbor's telephone, walked to a pay phone, or purchased a cellular telephone to use in case of an emergency. There is no evidence that Ingle Barr exempted Peterson from its rules simply because he did not own a home telephone.
 {¶ 41} Peterson's contention that he did not have notice that he was required to inform a supervisor if he would be absent is also unsupported. Ingle Barr produced a form signed by Peterson indicating that he had reviewed a copy of the policy manual instructing employees to notify the employer by 7:30 a.m. if they would be absent. Moreover, Bittendorf testified that Peterson had been absent on several occasions prior to March 2002, but contacted his employer to indicate he would not be working. Finally, Bittendorf warned Peterson in July 2002, before his final absence without notification, that future absences without notification would not be tolerated. Therefore, the record does not support Peterson's claim that he was unaware that he was required to telephone if he was not reporting to work.
 {¶ 42} Peterson was discharged for just cause because he repeatedly failed to report to work without notifying Ingle Barr that he would be absent. His second assignment of error is overruled.
 {¶ 43} Having overruled both of Peterson's assigned errors, we affirm the judgment of the trial court and the Commission's denial of unemployment compensation benefits. JUDGMENT AFFIRMED.
Abele, J., concurs in judgment and opinion.
Kline, P.J., dissents.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellees recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J.: Dissents.
Abele, J.: Concurs in Judgment and Opinion.
[1] The trial court mistakenly cited this case as Logan v.OBES.
[2] In Brown v. Dir., Ohio Dept. of Job Family Serv.,
Pickaway App. No. 02CA5, 2002-Ohio-3954, the claimant asserted that her termination was without just cause due to her former employer's failure to follow its progressive disciplinary system. However, we determined that the disciplinary system at issue allowed for the automatic termination of employees who committed certain egregious offenses, including the offense committed by the claimant.